UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ROSSANA CLARKE,                              )
as Administratrix of the                     )
Estate of Alejandro Clarke, Jr.              )
                                             )
JESSICA WOLLASTON,                           )
on behalf of, and as the natural mother of,  )
A.X.C., a minor                              )  Civil Action No. 3:22-cv-280-DJH
                                             )
And                                          )
                                             )
PAULA KENNEDY,                               )
on behalf of, and as the natural mother of,  )
A.A.C., a minor                              )
                                             )
                    *Plaintiffs*             )
                                             )
vs.                                          )
                                             )
DEPUTY JACOB DUKE,                           )
in his individual capacity                   )
as a Hardin County Deputy Sheriff            )
                                             )
        **SERVE:**   Jacob Duke              )
                     150 North Provident Way )
                     Suite 101               )
                     Elizabethtown, KY 42701 )
                                             )
LIEUTENANT TAYLOR MILLER,                    )
in his individual capacity                   )
as a Hardin County Deputy Sheriff            )
                                             )
        **SERVE:**   Taylor Miller           )
                     150 North Provident Way )
                     Suite 101               )
                     Elizabethtown, KY 42701 )
                                             )
TROOPER MATTHEW JOHNSON                      )
in his individual capacity                   )
as a Kentucky State Trooper                  )
                                             )
        **SERVE:**   Matthew Johnson         )
                     954 Cameron Ponder Dr   )
                     Elizabethtown, KY 42701 )

TROOPER DILLON SPENCER )
in his individual capacity )
as a Kentucky State Trooper )
)
    **SERVE:**    Dillon Spencer )
                954 Cameron Ponder Dr )
                Elizabethtown, KY 42701 )
)
TROOPER ETHAN WHITLOCK )
in his individual capacity )
as a Kentucky State Trooper )
)
    **SERVE:**    Ethan Whitlock )
                954 Cameron Ponder Dr )
                Elizabethtown, KY 42701 )
)
STANLEY COPELIN )
in his individual capacity )
as a Paramedic for Hardin County )
Emergency Medical Services )
)
    **SERVE:**    Stanley Copelin )
                170 N. Provident Way )
                Elizabethtown, KY 42701 )
)
LINDSAY SHARP )
in her individual capacity )
as an EMT for Hardin County )
Emergency Medical Services )
)
    **SERVE:**    Lindsay Sharp )
                170 N. Provident Way )
                Elizabethtown, KY 42701 )
And )
)
HARDIN COUNTY, KENTUCKY )
)
    **SERVE:**    Harry Berry )
                Judge Executive )
                150 N. Provident Way )
                Suite 314 )
                Elizabethtown, KY 42701 )

    *Defendants*

# **COMPLAINT**

1.    This is a claim for monetary damages under 42 U.S.C. § 1983 and state tort law against Defendants stemming from the fatal beating of Plaintiff. At the time Defendant Officers repeatedly struck and tased Plaintiff, as well as allowed a K-9 to maul him, Plaintiff posed no threat to Defendant Officers. At that time, Plaintiff was laying face down with five officers surrounding him. Plaintiff's left hand was behind his back, in handcuffs, and his right arm was moving around in the air. Defendant Officers use of force against Plaintiff violated his right to be free from unreasonable force in violation of the Fourth and/or Fourteenth Amendments to the United States Constitution. Additionally, Plaintiff raises a myriad of other federal and state law claims against Defendant Officers as a result of this egregious beating. Plaintiff further alleges claims against Defendant Medical Personnel who responded to the scene but failed to properly treat Plaintiff by following standard patient care protocols and transporting him to the hospital. Instead, Defendant Medical Personnel turned the care of Plaintiff back over to Defendant Officers and then watched as he was placed in the back seat of a cruiser, where he sat alone, and with no cardiac monitoring for 30 minutes. At some point while Plaintiff sat in the back of the cruiser, he went into cardiac arrest. When Defendant Officers finally noticed Plaintiff was not breathing, Defendant Medical Personnel, who were still on scene at the time, placed Plaintiff in the back of the ambulance and transported him to the hospital. Plaintiff died several hours later. Plaintiff claims the actions of Defendant Medical Personnel, as well as Defendant Officers, was negligent, reckless or wanton, and within the course and scope of their employment or, in the alternative, that, they acted intentionally, thereby violating Plaintiff's rights under Kentucky tort law.

## JURISDICTION AND VENUE

2.      This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

3.      Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the Western District of Kentucky, the judicial district in which all of the events giving rise to the claim occurred.

4.      Venue is also proper in the Western District of Kentucky pursuant to 28 U.S.C. § 1391(b)(l), as it is believed that Defendants reside in the Western District of Kentucky.

## PARTIES

5.      Plaintiff, Rossana Clarke, as the Administratrix of the Estate of Alejandro Clarke, Jr. ("Clarke"), was at all relevant times hereto, a resident of the Commonwealth of Kentucky. Rossana Clarke was appointed as Administratrix on September 28, 2021, Case Number 21-P-624, in the Hardin District Court.

6.      Plaintiff, Jessica Wollaston, as the natural mother, brings this action on behalf of A.X.C., the son of Alejandro Clarke, Jr. At all times relevant hereto, Jessica Wollaston and A.X.C. were residents of the Commonwealth of Kentucky.

7.      Plaintiff, Paula Kennedy, as the natural mother, brings this action on behalf of A.A.C., the son of Alejandro Clarke, Jr. At all times relevant hereto, Paula Kennedy and A.A.C. were residents of the Commonwealth of Kentucky.

8.      Defendant, Deputy Duke Jacob, was at all times relevant to this Complaint, a resident of the Commonwealth of Kentucky, employed by the Hardin County Sheriff's Office as a deputy sheriff, and acting under color of state law.

9. Defendant, Lieutenant Taylor Miller, was at all times relevant to this Complaint, a resident of the Commonwealth of Kentucky, employed by the Hardin County Sheriff's Office as a deputy sheriff, and acting under color of state law.

10. Defendant, Trooper Matthew Johnson, was at all times relevant to this Complaint, a resident of the Commonwealth of Kentucky, employed as a law enforcement officer by the Commonwealth of Kentucky, d/b/a Kentucky State Police, and acting under color of state law.

11. Defendant, Trooper Dillon Spencer, was at all times relevant to this Complaint, a resident of the Commonwealth of Kentucky, employed as a law enforcement officer by the Commonwealth of Kentucky, d/b/a Kentucky State Police, and acting under color of state law.

12. Defendant, Trooper Ethan Whitlock, was at all times relevant to this Complaint, a resident of the Commonwealth of Kentucky, employed as a law enforcement officer by the Commonwealth of Kentucky, d/b/a Kentucky State Police, and acting under color of state law.

13. Defendant, Stanley Copelin, was at all times relevant to this Complaint, a resident of the Commonwealth of Kentucky and employed as paramedic for Hardin County Emergency Medical Services.

14. Defendant, Lindsay Sharp, was at all times relevant to this Complaint, a resident of the Commonwealth of Kentucky and employed as an EMT for Hardin County Emergency Medical Services.

15. Defendant, Hardin County, Kentucky, is a local government entity organized and existing under Kentucky law. Hardin County was the employer of some of

the individual defendants named herein. Defendant Hardin County is responsible for the policies, practices, and customs of the Hardin County Sheriff's Department.

<h1 style="text-align:center"><strong><u>FACTS</u></strong></h1>

16.     At the time of his death, Clarke was 37 years old and a father of two minor children, A.X.C. and A.A.C.

17.     For at least the six months preceding his death, Clarke was having psychotic episodes, which included hallucinations, delusions, confusion, and mood changes. One particular hallucination/delusion was that Clarke believed someone was out to harm him.

18.     On May 26, 2021, Clarke was living with his girlfriend, Mellissa Robinson.

19.     Robinson and Clarke lived in a trailer located on the property of Elizabeth Vinson, Robinson's mother.

20.     The trailer sat adjacent to Vinson's home, which sat on several acres of land.

21.     At some point during the day, Clarke became agitated and started hallucinating—talking to an imaginary person and believing the television was giving him a message.

22.     As Robinson attempted to explain he was hallucinating, Clarke moved his hand toward her mouth, as if to stop her from talking. Robinson pushed Clarke's hand away, causing him to become agitated.

23.     Clarke then struck Robinson several times in the face before stopping.

24.     Robinson's mother, Vinson, subsequently came over to the trailer and saw her face.

25.     Robinson explained what had occurred and how Clarke was having a psychotic episode.

26.     Vinson told her daughter to go to the hospital and call the police.

27.     Before Robinson made it to the hospital, Vinson called 911 because she wanted Clarke off the property.

28.     Vinson told the 911 dispatcher her daughter was assaulted by Clarke, who had just snapped. She further explained how Clarke was experiencing a psychotic episode and talking to himself.

29.     Dispatch notified the Hardin County Sheriff's Office of the call, but Lieutenant Miller told dispatch to close the run until there was a victim.

30.     Couple hours later, a nurse called 911 on behalf of Robinson to report the domestic incident.

31.     Dispatch reopened the run and assigned it to Deputy Duke.

32.     At the hospital, Robinson told Deputy Duke what had transpired earlier. She explained how Clarke's behavior was abnormal and had been suffering from mental health issues, including psychosis, for at least the last six months.

33.     She expressly told Deputy Duke that she did not want Clarke arrested, but instead, committed so he could get the help he needed to address his mental health issues.

34.     Up until this point, Robinson and others had been trying to get Clarke help, but he refused to see any mental health providers.

35.     In response to Deputy Duke's question, Robinson told him that there were no guns or other weapons located inside the trailer, but there was a machete and a small homemade axe in Alex's vehicle.

36.     After leaving the hospital, Deputy Duke went to the home of Clarke's mother.

37.     Rosanna Clarke told Deputy Duke that her son had been over earlier and did not seem like himself.

38.     After leaving the apartment, Deputy Duke drove to the trailer, arriving at 1:00 a.m.

39.     Upon arriving, Deputy Duke spoke to Vinson, who told him Clarke was inside the trailer.

40.     Deputy Duke then walked over to the trailer and made contact with Clarke.

41.      After speaking with him, Deputy Duke grabbed Clarke's wrist and tried to arrest him, but he pulled away.

42.     Thereafter, some sort of a struggle ensued, which resulted in Deputy Duke discharging his taser at Clarke, but missing, and Clarke somehow biting Deputy Duke's forearm.

43.     Clarke then runs off and hides in the area surrounding the trailer and Vinson's home.

44.     Deputy Duke notifies dispatch he was bit but did not need medical assistance. Instead, he requested additional law enforcement personnel respond to assist in the search for Clarke.

45.     Deputy Duke also requested a K-9 unit.

46.     In response to Deputy Duke's request, Lieutenant Miller, Trooper Johnson and Trooper Spencer responded.

47.     Trooper Whitlock and his K-9 partner Dex also responded.

48.     Trooper Whitlock had been paired with Dex in November of 2020, and they trained together for only one month, before going into the field together.

49.     Upon information and belief, Dex was improperly trained and should not have been used in the field at the time.

50.     Around 1:45 a.m., Trooper Whitlock and Dex arrived at the property and started searching for Clarke.

51.     Lieutenant Miller, Trooper Johnson, and Trooper Spencer were already at the property.

52.     Upon hearing Dex bark, Vinson looked out the window and saw Deputy Duke, Lieutenant Miller, Trooper Johnson, Trooper Spencer, and Trooper Whitlock standing in her front yard yelling at Clarke to get on his stomach.

53.     At the time, the front porch flood lights were on so Vinson could clearly see what transpired 10 feet away.

54.     Vinson saw Clarke walking toward Defendant Officers and then lay down on his back, instead of on his stomach, with his hands next to his body on the ground.

55.     Vinson then heard one of the Defendant Officers say, "You're not listening to us."

56.     This prompted Clarke to sit up and respond, "I am listening to you."

57.     Vinson then observed four of the Defendant Officers, two on each side, approach Clarke.

58.     The two Defendant Officers on Clarke's left side pushed him forward onto his stomach, with one of the officers placing his right knee onto the small of his back while the other placed a handcuff on his left wrist.

59.     The two officers on Clarke's right side attempted to handcuff Clarke's right arm, but Clarke was moving it around in a non-threatening way.

60.     Unable to watch further, Vinson moved away from the window and did not look outside again until everything was quiet.

61.     At the time Vinson stopped watching, Clarke was not armed with a weapon or attempting to flee.

62.     Instead, all five officers surrounded Clarke as he was laying on his stomach, his left arm was secured behind his back by one of the Defendant Officers, and his left wrist was in a cuff.

63.     Clarke's right arm was the only part of his body moving around.

64.     Defendant Officers surrounding Clarke each weighed around 200 pounds and most stood 6 feet tall. Clarke on the other hand, was 5 feet 5 inches and weighed around 150 pounds.

65.     Despite Clarke showing only passive resistance by moving his right arm, Defendant Officers proceeded to engage in an egregious use of excessive force, claiming Clarke was resisting arrest.

66.     Clarke was tased at least four separate times, after being struck in the back with both dart probes.

67.     Trooper Whitlock sicced Dex on Clarke, allowing the dog to maul him—leaving him with three puncture wounds on his right arm and leg.

| | |
|---|---|
| Inside-Right Leg |  |
| Outside of Right Leg |  |

| Right Arm | |
|---|---|
| |  |

68.    Clarke was also repeatedly struck by Defendant Officers with their hands, asps, and upon information and belief, a Maglite.

| Head | |
|---|---|
| |  |

| | |
|---|---|
| Right Side |  |
| Left Side | |

69.     Clarke sustained extensive contusions, abrasions, and lacerations across his entire body as a result of the Defendant Officers' excessive use of force.

70.     Some of the injuries Clarke sustained included swelling and muscular hemorrhages around the right and left sides of his head, swelling around his face, a large

hematoma above his right eye, nasal bone fractures, diffuse cerebral and cervical spinal cord swelling, and muscular and soft tissue hemorrhages around the back of his neck.

71.     Next time Vinson looked out the window, she saw Clarke laying on his stomach, handcuffed.

72.     Defendant Officers were standing around him talking among themselves.

73.     At 2:03 a.m., Lieutenant Miller requested an ambulance because a taser was deployed. Lieutenant Miller said nothing about a K-9 also being deployed or that significant physical force was used.

74.     Upon information and belief, one of the Kentucky State Troopers notified KSP dispatch that a K-9 was deployed, but never mentions a taser being deployed or that significant physical force was used.

75.     Defendant Officers eventually picked Clarke up off the ground and walked him over to a bench located in Vinson's yard.

76.     One of the Defendant Officers sprinted over to Vinson's house asking for water, which he poured in Clarke's mouth and over his head.

77.     As Clarke sat on the bench, Vinson observed his head slowly sinking downward toward his chest, before raising back up, as if he were falling asleep.

78.     Defendant Officers observed this as well.

79.     At 2:14 a.m., Defendants Stanley Copelin, a paramedic, and Lindsay Sharp, an EMT, arrived, but appeared to be in no hurry to treat Clarke, who was considered a trauma patient.

80.     Two Defendant Officers picked Clarke up off the bench and walked him over to the ambulance.

81.     Vinson saw Clarke have trouble walking to the ambulance, even though he was being assisted.

82.     As he sat on the back of the ambulance, Copelin and Sharp performed an assessment.

83.     Clarke reported that he had shortness of breath and pain.

84.     Copelin and Sharp further observed that Clarke was anxious and restless, as well as had bruising across his entire toros, starches on his back, and puncture wounds to his arm and leg.

85.     After performing an assessment, Copelin and Sharp tried to get an EKG, which was required before Clarke could be released back into the Defendant Officer's care.

86.     The EKG was needed in order to see Clarke's blood pressure, O2 saturation levels, pulse, and other metrics that would allow Copelin and Sharp to assess whether he was having any heart problems.

87.     Copelin and Sharp claim that because Clarke was moving, they were unable to obtain his blood pressure or an accurate O2 saturation reading, both of which were needed to accurately assess whether Clarke had an irregular heartbeat or a potential heart problem.

88.     The EKG showed Clarke's pulse rate was 128, well above a normal heart rate, and O2 saturation of 73, well below normal O2 levels.

89.     A few minutes later, Clarke's pulse dropped to 51 and O2 saturation still remained low at 82.

90.     According to Patient Care Protocols issued by Kentucky Board of Emergency Medical Services, an individual with a heart rate of less than 60 should be been transported to the hospital immediately.

91.     The protocols further require transport to the hospital for anyone who has been tased one time—let alone 4 separate times. The protocols further require cardiac monitoring during the transport.

92.     Additionally, the standard protocols required a trauma patient, like Clarke, be rapidly transported to the hospital because the patient cannot be fully treated in the field and will rarely survive an in the field cardiac arrest.

93.     In direct contradiction to the standard protocols for emergency personnel, including the protocols identified above, as well as their training and experience, Clarke was not taken to the hospital, but instead, returned to the care of Defendant Officers who planned transport him to the hospital by way of cruiser instead of ambulance.

94.     Copelin signed a Medical Clearance for Taser Injuries form at 2:28 a.m., which allowed Clarke to be transported to the hospital by Defendant Officers.

95.     After the form was signed, Clarke was walked by two Defendant Officers over to a cruiser and placed in the back seat.

96.     From around 2:28 a.m. to 2:55 a.m., Clarke sat in the back of the cruiser.

97.     During this time, one of the Defendant Officers was walking behind the cruiser talking on the phone.

98.     Copelin or Sharp remained on scene during this time, however, they never reevaluated Clarke to assess whether his vitals had changed or if an accurate blood pressure and O2 saturation could be obtained.

99.     After the Defendant Officer got off the phone, he notified Copelin and Sharp that something was wrong with Clarke.

100.    Vinson watched as Clarke was  removed from the cruiser, appearing lifeless, and placed on the stretcher.

101.    Copelin and Sharp immediately started CPR on Clarke, who was barely breathing and had no pulse.

102.    At 3:25 p.m., Clarke arrived at the hospital with CPR still in progress.

103.    Copelin and Sharp were unable to tell medical personnel at the hospital how long Clarke had been unconscious and not breathing.

104.    A CT scan performed on Clarke indicated he suffered an anoxic brain injury.

105.    Had Clarke been rapidly transported to the hospital, he would have either suffered cardiac arrest in the ambulance where Copelin and Sharp could have immediately started CPR to ensure oxygen continued to go to his brain or he would have suffered cardiac arrest at the hospital where medical personnel are better equipped to perform the life saving measures and upon information and belief, could have saved Clarke's life.

106.    An autopsy performed on Clarke the following day found he died from multiple complications following cardiac arrest due to the injuries he sustained from Defendant Officers' objectively unreasonable use of force.

**COUNT I**
**EXCESSIVE FORCE UNDER 42 U.S.C. § 1983**

107.    Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

108.    The aforementioned conduct of Defendant Officers amounts to the unreasonable and excessive use of force within the meaning of the Fourth and/or Fourteenth Amendments.

109.     The actions of Defendant Officers were without just and legal cause, thereby violating Clarke's rights under the Constitution and laws of the United States, as enumerated above, as well as his rights under the Constitution of the Commonwealth of Kentucky.

110.     The above-described acts of Defendant Officers were not objectively reasonable under the circumstances.

111.     At the time force was used, Clarke was complying with Defendant Officers' commands, he was laying on the ground, one of his hands was cuffed and behind his back, and Defendant Officers could see he did not have a weapon.

112.     Clarke's only movement at the time was his right arm, the only part of his body that Defendant Officers had not yet secured.

113.     Clarke's movement of his right arm amounts to nothing more than passive resistance.

114.     Clarke posed no safety risk to Defendant Officers at the time force was used, and he was not able to flee because Defendant Officers were physically restraining him on the ground.

115.     No objectively reasonable officer in Defendant Officers' positions would have believed that Clarke's passive resistance would justify using any force against him, let alone the level of force that Defendant Officers used in this case.

116.     As the direct and proximate result of the aforementioned actions of Defendant Officers, Clarke suffered the destruction of his power to labor and earn money, endured pain and suffering, lost his life, and incurred funeral expenses.

**COUNT II**
**FAILURE TO INTERVENE UNDER 42 U.S.C. § 1983**

117.    Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

118.    In the manner described above, during the constitutional violations described herein, Defendant Officers stood by without intervening to prevent the violation of Clarke's constitutional rights, even though they had the opportunity to stop the excessive use of force.

119.    Any reasonable law enforcement officer in Defendant Officers' situation would or should have known that a substantial deprivation of  Clarke's constitutional rights was likely to occur, and indeed was ongoing throughout the entire time Defendant Officers beat a helpless man laying face down on the ground.

120.    The misconduct described herein was objectively unreasonable and undertaken intentionally, recklessly, and/or with willful indifference to Clarke's constitutional rights.

121.    As a direct result of Defendant Officers' failure to intervene to prevent the violation of Clarke's constitutional rights, he suffered the destruction of his power to labor and earn money, endured pain and suffering, lost his life, and incurred funeral expenses.

<u>COUNT III</u>
**CIVIL CONSPIRACY UNDER <u>42 U.S.C. § 1983</u> AND STATE LAW**

122.    Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

123.    Clarke suffered serious harm because of a conspiracy between Defendant Officers to beat him and then cover up their actions by claiming he resisted arrest.

124.    Defendants working in concert and/or with the approval of each other, entered into an agreement to deprive Clarke of his right to be free from unreasonable force.

125.    Defendant Officers acted in furtherance of the conspiracy by assaulting Clarke.

126.    Defendant Officers, along with Defendant Medical Personnel, further conspired among themselves to cover up Clarke's assault by not transporting to the hospital by ambulance and ensuring that he did not receive adequate medical care by having Defendant Medical Personnel return Clarke into their care, even though his condition at the time required immediate transport to the hospital.

127.    Defendant Medical Personnel acted in furtherance of the conspiracy by allowing Clarke to be returned to Defendant Officers' care, instead of immediately transported to the hospital.

128.    Said conspiracy violated Clarke's rights under the United States Constitution, as set forth in the sections above, and under the Kentucky common law.

129.    The conspiracy to violate Reece's constitutional rights is actionable under 42 U.S.C. § 1983.

130.    As a direct and proximate result of Defendants' conduct, Clarke has been damaged in an amount exceeding the jurisdictional limits of this Court, as described further herein.

## COUNT IV
## SUPERVISORY LIABILITY AGAINST UNDER 42 U.S.C. § 1983

131.    Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

132.    Defendant Hardin County, by and through its final policymakers, with deliberate indifference, maintained a policy, custom, or pattern and practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional behavior by their law enforcement officers, including use of excessive force against individuals suffering from a mental health crisis.

133.    The harm suffered by Clarke was so obvious, and the failure of Defendant Hardin County to train their agents/employees or to institute a policy to avoid harms was so likely to result in the violation of constitutional rights, that the Defendant Hardin County can reasonably be said to have been deliberately indifferent to the need.

134.    Upon information and belief, Defendant Hardin County possessed actual knowledge indicating a deficiency with the existing policy or training (or lack thereof) such that it knew or should have known that constitutional violations such as those alleged herein were likely to occur.

135.    The need to act should have been plainly obvious to Defendant Hardin County's policymakers, who, nevertheless, were deliberately indifferent to the need.

136.    Defendant Hardin County's policies, customs, patterns, practices, and/or failure to act directly resulted in the excessive force used against Clarke as well as the other grievous and continuing injuries and damages as set forth herein.

## COUNT V
## AIDING AND ABETTING

137.    Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

138.    Defendant Officers battered Clarke pursuant to a common plan.

139.    Each of the Defendant Officers aided and abetted the battery of Clarke in violation of Kentucky common law.

140.    Defendant Officers knew the conduct of the other Defendant Officers in beating Clarke constituted a breach of duty.

141.    Defendant Officers encouraged and/or provided substantial assistance in the battery.

142.    Defendant Medical Personnel aided and abetted Defendant Officers by failing to transport Clarke to the hospital, instead, releasing him back to the care of Defendant Officers.

143.    As a direct and proximate result of Defendants' conduct, Clarke has been damaged in an amount exceeding the jurisdictional limits of this Court, as described further herein.

## COUNT VI
## BATTERY

144.    Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

145.    The aforementioned conduct of Defendant Officers toward Clarke constitutes the tort battery.

146.     As detailed in above paragraphs, Defendant Officers, without privilege or provocation, intentionally, maliciously, wantonly and/or recklessly made numerous offensive and/or harmful contacts with Clarke.

147.     As a result of these harmful contacts Clarke suffered the destruction of his power to labor and earn money, endured pain and suffering, lost his life, and incurred funeral expenses.

**COUNT VII**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

148.     Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

149.     Defendants' treatment of Clarke was so beyond the bounds of human decency that it exemplifies the tort of outrage, also known as intentional infliction of emotional distress.

150.     As a direct and proximate result of Defendants' conduct, Clarke has been damaged in an amount exceeding the jurisdictional limits of this Court.

**COUNT VIII**
**NEGLIGENCE AND WRONGFUL DEATH**

151.     Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

152.     Defendant Officers owed Clarke a duty not to exceed their police powers during the course of an arrest.

153.     Defendant Officers, through negligence, gross negligence, recklessness, wantoness, and/or a willful disregard, breached this duty by exerting excessive force against Clarke, resulting in injuries.

154.     Defendant Officers' breach was the actual and proximate cause of Clarke's injuries and eventual death.

155.     Defendant Officers thus deprived Clarke of rights secured by Kentucky tort law.

156.     Plaintiffs have suffered harm from Clarke's death, including but not limited to, past and future lost wages and earning potential; funeral expenses; physical, mental, and emotional distress; loss of love an affection; wrongful death; and any other harm recognized under Kentucky law.

157.     Accordingly, and pursuant to KRS 411.130, Plaintiffs are entitled to damages from the Defendant Officers, jointly and severally, for actual, special, punitive, and compensatory damages in an amount exceeding the minimum jurisdictional limits of this Court.

**COUNT IX**
**LOSS OF PARENTAL CONSORTIUM**

158.     Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

159.     A.X.C., a minor, has suffered damages including the loss of love, affection, and companionship of his father, Clarke.

160.     A.A.C., a minor, has suffered damages including the loss of love, affection, and companionship of his father, Clarke.

161.    A.X.C. and A.A.C. are entitlted to recover damages for loss of parental consortium pursuant to KRS 411.135 and applicable case law.

162.    The willful and/or grossly negligent acts of the Defendant Officers entitlted Plaintiff to punitive damages.

163.    Accordingly, A.X.C. and A.A.C. are entitled to damages from the Defendant Officers, jointly or severally, for actual, special, punitive, and compensatory damages for loss of parental consortium, as well as all other elements of damages recoverable for wrongful death, in an amount exceeding the minimum jurisdictional limits of this Court.

<u>COUNT X</u>
**NEGLIGENCE, GROSS NEGLIGENCE,**
**AND PROFESSIONAL NEGLIGENCE**

164.    Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

165.    All Defendants had a duty to timely treat Clarke's medical condition as would a reasonable person.

166.    As set forth above, all Defendants were negligent and grossly negligent, and breached their duty/duties to Clarke.

167.    In addition, Copelin and Sharp failed to meet the standard of care applicable to the professions of which they individually practice.

168.    Copelin and Sharp were required, at minimum, to follow the standard protocols for all EMS personnel in Kentucky, which required Clarke to be rapidly transported to the hospital based on his medical condition.

169.    Defendants' breach of duty and failure to meet the applicable standard(s) of care was done in bad faith.

170.    As a direct and proximate result of Defendants' conduct, Clarke has been damaged in an amount exceeding the jurisdictional limits of this Court.

## COUNT XI
### Violation of KRS 258.235

171.    Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

172.    KRS 446.070 creates a private right of action for the violation of any statute, including KRS 258.235.

173.    Under KRS 258.095, Defendant Whitlock is the "owner" of Dex because he keeps or harbors the dog as well as has the dog in his care.

174.    Defendant Whitlock had knowledge that Clarke would be in the vicinity of Dex because Whitlock allowed Dex to attack Clarke.

175.    Defendant Whitlock further failed to exercise ordinary care to control Dex for the safety of Clarke and others.

176.    Defendant Whitlock's above-described actions were a substantial factor in causing Clarke's injuries.

177.    As a result of the attack, Defendant Whitlock is strictly liable to Clarke for all resulting damages pursuant to KRS § 258.990 and KRS § 258.235.

178.    Defendant Whitlock's conduct rises to the level of gross negligence or otherwise constitutes malice due to its reckless, wanton or intentional nature which justifies an award for exemplary or punitive damages against him to punish him and to discourage him and others from similar conduct in the future.

179.    As a direct and proximate result of Defendant Whitlock's conduct, Clarke

has been damaged in an amount exceeding the jurisdictional limits of this Court.

**COUNT XII**
**PUNITIVE DAMAGES**

180. Plaintiffs incorporate by reference, as if set forth fully herein, each and every averment, allegation, or statement contained in the previous paragraphs of this Complaint.

181. The aforementioned conduct of Defendants was negligent, grossly negligent, malicious, oppressive, and/or fraudulent, thus entitling Clarke to punitive damages from Defendants.

**WHEREFORE,** Plaintiffs pray as follows:

A. That the Court award compensatory damages to Plaintiffs and against the Defendants, jointly and severally, in an amount to be determined at trial;

B. That the Court award punitive damages to Plaintiffs in an amount, to be determined at trial that will deter such conduct by Defendants in the future;

C. For a trial by jury;

D. For pre-judgment and post-judgment interest and recovery of their costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims and costs pursuant to 42 U.S.C. § 1920; and

E. For any and all other relief to which they may be entitled.

Respectfully submitted,

*/s/ David N. Ward*
GARRY R. ADAMS
DAVID N. WARD
ADAMS LANDENWICH & WALTON, PLLC
517 West Ormsby Avenue
Louisville, Kentucky 40203
(502) 561-0085
garry@justiceky.com
david@justiceky.com
*Counsel for Plaintiffs*